UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JEFFREY CATO,

                        Petitioner,                     Case No. 1:08-cv-1146

v.                                        Honorable Paul L. Maloney

JOHN PRELESNIK,

                        Respondent.

_____/

### REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner Jeffrey Cato was convicted by a Wayne County jury of one count of second-degree murder, MICH. COMP. LAWS § 750.317, two counts of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89, one count of being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and one count of possessing a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. He was sentenced on October 9, 2002 to respective prison terms of 25 years to 40 years and 8 months, 15 to 30 years, 1 to 5 years and 2 years. In his *pro se* petition, Petitioner initially raised ten grounds for relief, as follows:

    I.        GIVEN THE TRIAL COURT'S FACTUAL FINDING, DID THE TRIAL COURT REVERSIBLY ERR IN CONCLUDING THAT THE PROSECUTOR HAD MET ITS BURDEN OF PROOF TO SHOW A VALID WAIVER OF [PETITIONER'S] RIGHT TO COUNSEL DURING CUSTODIAL INTERROGATION AND DENYING THE [PETITIONER'S] MOTION TO SUPPRESS.

    II.      THE TRIAL COURT VIOLATED [PETITIONER'S] FEDERAL CONSTITUTIONAL RIGHTS, US CONST, AMS V, VI, XIV, AT

SENTENCING BY SCORING THE STATUTORY SENTENCING GUIDELINES BASED ON ITS FINDING OF ADDITIONAL FACTS, WHICH THE PROSECUTOR HAD NOT CHARG[ED], WHICH HAD NOT BEEN SUBMITTED TO THE JURY, AND WHICH [PETITIONER] HAD NOT ADMITTED. . . .

III.[1]   [PETITIONER] WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL WHEN HE WAS CONVICTED ON THE BASIS OF A TAINTED IN-COURT IDENTIFICATION WHICH WAS UNNECESSAR[IL]Y SUGGESTIVE AND CONDUCIVE TO IRREPARABLE MISTAKEN IDENTIFICATION.

IV.   [PETITIONER] WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE PROSECUTOR VOUCHED FOR THE CREDIBILITY OF HIS OWN WITNESS.

V.   [PETITIONER'S] CONVICTION MUST BE REVERSED WHERE IT WAS BASED ON A CONFESSION PROCURED THROUGH DECEPTION AND A PROMISE OF LENIENCY WHICH WAS "COERCIVE" IN VIOLATION OF [PETITIONER'S] FIFTH AND FOURTEENTH AMENDMENT RIGHTS AGAINST SELF INCRIMINATION: APPELLATE COUNSEL WAS INEFFECTIVE IN FAILING TO CHALLENGE THE STATEMENT ON PROPER GROUNDS.

VI.   [PETITIONER] WAS DEPRIVED [OF] DUE PROCESS AND EQUAL PROTECTION UNDER THE LAW WHEN THE PROSECUTOR WAS ALLOWED TO "INDUCE" CODEFENDANT DESEAN BUTLER TO TESTIFY FOR THE PROSECUTION WITH PROMISES OF LENIENCY.

VII.   [PETITIONER] WAS DENIED HIS CONSTITUTIONAL RIGHT TO CONFRONTATION WHEN DR. L[EI]GH HLAVATY AN ASSISTANT MEDICAL EXAMINER WAS ALLOWED TO TESTIFY IN THE PLACE OF THE ACTUAL PERSON WHO PERFORMED THE AUTOPSY.

VIII.   [PETITIONER] WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE PROSECUTOR'S IMPROPER COMMENTS DURING CLOSING ARGUMENTS, AND HIS USE OF THE PLEA AGREEMENT OF

---

[1]In his recitation of his grounds for habeas relief, Petitioner numbers the first and second grounds for relief as Grounds I and II. Beginning with his third issue, however, Petitioner begins to renumber, listing the remaining eight grounds as Grounds I through VIII. For the sake of clarity, the Court has renumbered the grounds in the order listed by Petitioner as Grounds I through X.

CODEFENDANT BUTLER TO VOUCH FOR THE WITNESS'S CREDIBILITY, FAILED TO SECURE EXPERT TESTIMONY REGARDING EYEWITNESS IDENTIFICATION, AND FAILED TO SECURE PROPER JURY INSTRUCTIONS, AND FAILED TO OBJECT TO HEARSAY EVIDENCE.

IX.     [PETITIONER] WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL DUE TO CUMULATIVE EFFECT OF THE PREJUDICIAL ERRORS WHICH OCCURRED DURING HIS TRIAL.

X.     [PETITIONER] WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL WHEN APPELLATE COUNSEL FAILED TO CHALLENGE/AND OR ADVOCATE FOR APPELLATE REVIEW ISSUES THAT WERE BOTH "OBVIOUS AND SIGNIFICANT." GOOD CAUSE AND PREJUDICE.

(Br. in Supp. of Pet., docket #2, Page ID##212-13; Mot. to Supp. Pet., docket #35.) Respondent filed an answer to the petition (docket #7) stating that the grounds should be denied because they are either procedurally defaulted or without merit. On January 5, 2010, Petitioner filed a motion to supplement his petition to add an actual innocence claim as a response to the defense of procedural default. (Mot. to Amend, docket #35.) The Court granted Petitioner's motion to amend his petition on February 22, 2010, allowing an eleventh claim of actual innocence to serve as cause excusing his procedural default. (Mem. Op. & Ord., docket ##40-41.) Petitioner subsequently filed a second motion to amend his petition to argue insufficiency of the evidence, which the Court denied because it was time-barred. (*See* Ord. Adopting R&R, docket #49.) Upon review and applying the AEDPA standards, I find that all of Petitioner's claims are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from the shooting death of Michael Staunton, one of two men working in the City of Detroit to repair a pay phone, which occurred shortly before midnight on the night of September 10, 2001.  Petitioner was charged with first-degree felony murder, MICH. COMP. LAWS § 750.316(1)(b); assault with intent to murder, MICH. COMP. LAWS § 750.83; assault with intent to rob while armed, MICH. COMP. LAWS § 750.89; being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f; and possessing a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  Following a preliminary examination held February 12, 2002, Petitioner was bound over on all charges.

In the months leading up to trial, defense counsel filed a motion to suppress Petitioner's statement of January 26, 2002, arguing that Petitioner had invoked his right to counsel and had involuntarily waived his rights under *Miranda v. Arizona*, 385 U.S. 436 (1966).   An evidentiary hearing was held over a period of three days:  April 12, 2002, April 26, 2002, and June 21, 2002.  (4/12/02 Hr'g Tr., 4/26/02 Hr'g Tr., 6/21/02 Hr'g Tr. (hereafter, Hr'g Tr. I-III ), docket ##15-17.)   The trial court ultimately denied Petitioner's motion to suppress.  (Hr'g Tr. III at 19, docket ##17.)

A jury was picked on August 26, 2002, and Petitioner was tried before that jury beginning on September 9, 2002 and concluding on September 10, 2002.  Prior to jury selection, an amended information was filed, in which Petitioner was charged with a second count of assault with intent to rob while armed.  (Tr. I at 4, docket #18.)

Curtis Johns testified that he was employed as a police officer for the City of Detroit on the night of the shooting, September 10, 2001. He and his partner, Officer Edward Davis, began work at midnight on September 11, 2001. Johns drove the police cruiser. Shortly after the start of their shift, he saw four to five unknown men run across westbound Fitzpatrick near Chicago and enter the passenger door of a black Jeep Cherokee. (Tr. II at 38, docket #19.) The vehicle sped away, eastbound on Chicago, amid squealing tires. (*Id.* at 38-39.) Officers Johns and Davis followed, and Johns saw the car turn onto the Southfield Road service drive. Davis entered the vehicle plate number into the LEIN system. (*Id.* at 39.) The officers continued to follow the Jeep, though they did not activate their lights or siren. When the LEIN system reported that the vehicle was stolen, they were near the intersection of Southfield and Joy Roads. Johns activated his lights and siren, and the Jeep sped up, traveling westbound on Joy Road. The Jeep crashed near the intersection of Joy and Evergreen Roads, and the occupants all bailed out the passenger side of the vehicle. (*Id.* at 40.) The officers chased after the men, catching two: Desean Butler and Rahim Jones. (*Id.* at 41.) The were unable to catch a man Officer Johns described as being a black male aged 18 to 22, between 5' 9" and 6', who had a large afro and was wearing a red shirt and black pants. (*Id.* at 42.) After detaining Butler and Jones, Officer Davis inventoried the vehicle. He asked Officer Johns to come over, and they both observed a silver, .38 caliber revolver and a 12" black butt stock from a long gun on the front passenger floorboard. The revolver had four live rounds in the cylinder. (*Id.* at 44-45.) The revolver, butt stock and Jeep were held for fingerprints. (*Id.* at 50.)

Detroit Police Officer Edward Davis testified similarly. (*Id.* at 52-61.) Davis testified that following the accident, he personally apprehended Rahim Jamal Jones, one of the four occupants of the Jeep. He described a third occupant as being a black male, between 18 and 22 years of age,

- 5 -

5' 9" to 6', 150 to 175 pounds, with a large afro, who was wearing a red shirt and black pants.  (*Id.* at 55.)  According to Davis, the six-shot .38 Special revolver with four live rounds was found on the front passenger floorboard.  (*Id.* at 57.)  A black rifle stock was found in the back seat.  (*Id.* at 58.)

Detroit Police Evidence Technician Michael Carpenter testified that he tested the black gunstock for fingerprints, but he found none.  (*Id.* at 67.)  Carpenter stated that fingerprints are found on only about ten percent of the objects tested.  (*Id.*)

Michael Pemberton testified that he had worked for Michigan Public Telephone for about 15 years.  His life-long friend, Michael Staunton, also worked for Michigan Public Telephone on September 10, 2001.  (*Id.* at 72-73.)  In those jobs, Pemberton and Staunton repaired public telephones and ATMs.  On September 10, 2001, they were both working on telephone routes.  (*Id.* at 74.)  Staunton contacted Pemberton to assist him with a pay phone located at Joy Road and Patton.  (*Id.* at 75.)  Pemberton was on a route far away and could not help Staunton at that time, so he told Staunton to leave the job until later.  (*Id.* at 76.)  Pemberton finished his own route and got to the Joy and Patton location at about 11:30 or 11:45 p.m..  Staunton arrived at about the same time.  Staunton drove a white Ford Explorer, and Pemberton drove a maroon Ford Escort.  They pulled their vehicles within ten feet of the pay phone.  (*Id.* at 77-78.)  While the two were working on the phone, they were approached by several vehicles driving by, including a black Jeep Cherokee.  Pemberton and Staunton frequently were approached for drug or stolen-property sales when they were working in certain areas of the city.  They also were approached by two black men on foot, who came out of a nearby alley.  (*Id.* at 80-82.)  Pemberton and Staunton backed away from the phone, to let the other men know that they needed to find another phone.  Staunton told the men that the phone was broken.  The two men, however, did not leave.  (*Id.* at 83.)  The man standing to Pemberton's right asked him

repeatedly if they were the police.  That man was skinny, had an afro, and was wearing a red shirt.

Pemberton identified Petitioner as that man.  (*Id.* at 84-85.)  The men split up to either side of

Pemberton's car, though the other man kept stepping away to look down Joy Road.  Pemberton

began to feel that he and Staunton were in trouble.  (*Id.* at 86-87.)  Both of the strangers then pulled

out pistols.  Petitioner had a long-barreled black pistol, and he stood in front of Staunton.  The other

man had a shorter-barreled chrome pistol, and he stood in front of Pemberton.  (*Id.* at 110-11.)  The

men began shooting and running, and Pemberton heard a total of between two and five shots.  (*Id.*

at 87-88.) When the shooting started, Pemberton was standing at the front bumper of his car, and he

ducked down.  (*Id.* at 88-89.)  Pemberton could see Staunton when the shooting started.  (*Id.* at 92.)

After the shooting stopped, Pemberton got into his car.  Staunton beat on Pemberton's passenger

window twice and said, "They shot me."  (*Id.* at 93.)  Staunton got into Pemberton's car and laid his

head down.  Pemberton then drove to Oakwood Hospital as fast as he could.  (*Id.*)  When they

arrived at the hospital, Pemberton was informed that Staunton had died.  (*Id.* at 94.)  At Oakwood

Hospital, Pemberton gave the police a description of the two suspects and their handguns.  (*Id.* at 89-

92.)  He gave a complete statement at about 2:00 p.m. on September 11, 2001.  (*Id.* at 95.)

   Evidence technician Donald Rem testified that he and fellow technician Mary Gross

arrived at the scene at approximately 2:30 a.m.  (*Id.* at 122-24.)  They took photographs, collected

evidence and sketched the scene.  (*Id.* at 124.)  According to Rem, the ambient lighting was

sufficient to see what they needed to see.  (*Id.* at 124-25.)  They found no bullets or casings in the

area, though casings would not have been ejected from a revolver.  (*Id.* at 130-31.)

   Desean Butler testified that he was traveling in a dark-colored Cherokee on

September 10, 2001, accompanied by Rahim, Mario Jones, Petitioner and Nelson Page.  They had

picked up Petitioner between 5:00 and 6:00 p.m.  He did not know Petitioner before that, but he had

seen him around.  According to Butler, Petitioner had a long afro at that time.  (*Id.* at 135-36.)  Butler

had gotten the vehicle from a friend, and he knew it was stolen.  They started the Jeep with a

screwdriver.  (*Id.* at 137.)  Either Butler or Page was driving the vehicle initially.  Butler stated that

he was going to "hit a lick," meaning rob someone.  (*Id.* at 137-38.)  At some point, the occupants

saw a vehicle with gold-rimmed tires.  Rahim and Petitioner got out of the car to rob the driver, but

the vehicle pulled away too soon.  According to Butler, both had guns, but Petitioner had something

like a rifle, with a longer barrel, about 24 inches in total length.  (*Id.* at 139-40.)   Later, at about

10:30 or 11:00 p.m, the group saw two white men by the pay phone.  At this point, Mario Jones was

driving the car.  They stopped and tried to approach the men about buying drugs.  (*Id.* at 140-41.)

The group drove around the corner and stopped.  Rahim gave his chrome pistol to Nelson Page.  (*Id.*

at 141-42.)  Petitioner and Page got out of the car.  (*Id.* at 143-44.)  Butler saw Page put the gun in

his pocket, but he did not remember whether Petitioner had his gun.  (*Id.* at 144.)  The two walked

down an alley.  (*Id.*)  Sometime after the two walked away, Butler heard one gunshot.  Petitioner and

Page came back to the vehicle, acting nervous and scared.  (*Id.* at 145.)  Butler identified Exhibit 4

as a chrome gun like the one that Page had gotten from Rahim.  (*Id.* at 146.)  Butler remembered

Nelson saying that Petitioner had shot one of the guns.  (*Id.* at 147-48.)  Petitioner stated that "he

tried to scare him, make him stop running."  (*Id.* at 148.)  The group left the area.  They stopped at

a gas station, and Petitioner and Rahim got out.  When they came back to the car, Rahim stated that

he had pointed the gun at a man, but had "pulled off."  (*Id.* at 149.)  After they left the gas station,

a police car flashed its lights at them.  The driver of the vehicle, Mario, tried to flee from the police,

ultimately crashing the vehicle into a Ford Taurus. (*Id.* at 149-50.)  The occupants fled, but the police

caught Butler and Rahim. (*Id.* at 150-51.) Butler gave two statements to police, one on September

11 and one on September 13, 2001. (*Id.* at 151.) On September 11, Butler told police that Mario

had committed the shooting. (*Id.* at 158.) On September 13, however, Butler stated that Petitioner

had a rifle and that Rahim had the pistol. (*Id.* at 152.) After refreshing his recollection, Butler

remembered telling police that Petitioner had the rifle when he got out of the Jeep. (*Id.* at 152.)

Butler testified that he had entered into a plea agreement, under which, in exchange for his truthful

testimony, he would receive a sentence of five to fifteen years for manslaughter. (*Id.* at 154.)

Detroit Police Investigator Barbara Simon identified the pistol and the gunstock as

those with identification numbers corresponding to the items taken from the Jeep Cherokee. (*Id.* at

166-68.) Simon testified that she interviewed Petitioner on January 26, 2002, after she read him his

constitutional rights and he signed the rights form. (*Id.* at 169-70.) Simon wrote Petitioner's

answers to questions, and Petitioner signed or initialed each statement – a total of 26 times. (*Id.* at

172-82.) In his statement, Petitioner indicated that he and Nelson Page got out of the vehicle.

Petitioner took the pistol, and Page took the rifle. They approached Staunton and Pemberton, and

Nelson said, "Lay it down." (*Id.* at 176-77.) The two men started backing up toward their cars.

When one of the men turned around, Petitioner saw Nelson fire the gun and saw the man fall to the

ground. (*Id.* at 177, 182.) He and Nelson ran back to the truck, and the men drove back toward the

intersection of Joy Road and Southfield Road. The police signaled them and then chased the vehicle

until it crashed. Petitioner stated that he ran to West Warren, where he caught the bus home. (*Id.*

at 177-78.) The next day, Petitioner told his mother what had happened. She advised him to turn

himself in and tell the police what happened. (*Id.* at 178.) Petitioner also stated that he heard only

one gunshot. (*Id.*)

Medical examiner Dr. Leigh Hlavaty testified that his colleague, Dr. Schmidt, conducted the autopsy, but was unavailable on the day of trial. Hlavaty testified that, from his professional evaluation of the record, the autopsy showed two injuries, an entrance gunshot wound on the left lower back, and an exit gunshot wound on the left groin. (*Id.* at 189.) The injury caused extensive bleeding and damage to the bowels, which would have resulted in death from blood loss within four to five minutes. (*Id.* at 191.) No bullets were found in the body, though three old shotgun pellets were found in the left hip and both knees. (*Id.* at 192.)

The parties stipulated that Petitioner was not eligible to possess a handgun or gun. The people then rested. (*Id.* at 195-96.)

Petitioner testified that he did not possess or fire a weapon on the evening of September 10 or September 11, 2001. (*Id.* at 198.) He stated that the other members of the group picked him up at about 2:30 p.m. The men drove around smoking marijuana for awhile. The group dropped Petitioner off at about 3:15 p.m. and then came back and picked him up again at about 5:30 p.m. They dropped him off again at about 9:00 p.m. (*Id.* at 204-05.) Petitioner denied being in the Jeep at the time of the crash, and he denied wearing a red shirt or having a large afro on the night of the incident. (*Id.* at 202.) Petitioner claimed that he did not say what Detective Simon wrote in the statement from the January 26, 2002 interview. He simply signed and initialed the answer to each question without reading what Simon had written, because he wanted to go home. (*Id.* at 206-09, 213-16.) The defense rested and the jury was excused for the day. (*Id.* at 219-20.)

The court then heard testimony from Detective Simon about the prosecution's efforts to locate witness Robert Hopkins, who was endorsed on the information but not presented at trial. (*Id.* at 221-242.) The following day, before closing arguments, the court held that the prosecution

had not met its burden of showing due diligence in obtaining the appearance of Robert Hopkins. The court therefore indicated that it would be giving the adverse-witness instruction. (Tr. III at 3-4.)

At the conclusion of trial, on September 10, 2002, the jury found Petitioner not guilty of first-degree felony murder, but guilty of second-degree murder, a lesser included offense. The jury also found Petitioner guilty of two counts of assault with intent to rob while armed, one count of possessing a firearm during the commission of a felony, and one count of being a felon in possession of a firearm. (Tr. III at 65.) Because the jury verdict form had inadvertently omitted a question regarding the charge of assault with intent to murder, the court sent the jury back to the jury room, over the objection of defense counsel, to deliberate on the charge of assault with intent to murder. A few minutes later, the jury returned with a verdict of not guilty on the charge of assault with intent to murder. (*Id.* at 72.)

On October 9, 2002, Petitioner was sentenced to serve a prison term of 25 to 40 years and 8 months on the murder conviction, 15 to 30 years on each assault-with-intent-to-rob conviction, 1 to 5 years on the felon-in-possession conviction, and 2 years on the felony-firearm conviction. (Sentencing Transcript (S. Tr.), 15, docket #21.)

**B.    Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on December 15, 2003, raised two issues, the first of which is raised as Ground I of the instant application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #22.) By unpublished opinion issued on June 3, 2004, the Michigan Court of Appeals affirmed the convictions and sentences, but granted Petitioner's second claim on appeal for correction of the presentence report. (*See* 6/3/04 Mich. Ct. App. Opinion (MCOA Op.), docket #22.)

- 11 -

Petitioner, through counsel, filed an application for leave to appeal to the Michigan Supreme Court.  Petitioner presented the first claim raised before and rejected by the Michigan Court of Appeals.  Petitioner added a second, new claim based on the recently issued decision in *Blakely v. Washington*, 542 U.S. 296 (2004), which is included as Ground II of the instant habeas petition.  By order entered January 27, 2005, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #23.)

### C.     Motion for post-conviction relief

In April 2006, Petitioner filed a motion for relief from judgment, in which he raised eight issues.  Those issues are set forth as Grounds III to X of the habeas application.  In an order issued June 1, 2006, the trial court denied the motion, holding that Petitioner had failed to demonstrate the necessary cause and prejudice required to excuse Petitioner's procedural default, as described in MICH. CT. R. 6.508(D)(3)(a) and (b).  (*See* 6/1/06 Cir. Ct. Op. at 1-2, docket #24.)  Specifically, the court concluded that Petitioner's claims of ineffective assistance of trial and appellate counsel, set forth as issues VI and VIII of his motion for relief from judgment, were without merit and therefore could not excuse his failure to raise the issues at trial and on appeal.  (*Id.*)  Nevertheless, "in the interest of providing defendant with a substantive review of his motion," the court considered and rejected each of the remaining claims on the merits.  (*Id.* at 2-4.)

Petitioner sought leave to appeal the denial of his motion to both the Michigan Court of Appeals and the Michigan Supreme Court.  Both courts denied leave to appeal on the grounds that Petitioner had failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D).  (*See* 12/14/07 MCOA Ord., docket #24; 6/23/08 Mich. Ord., docket #25.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I.      Grounds I and V:  Invalid Waiver of *Miranda* Rights

Petitioner's first ground for habeas relief was the sole issue presented to the Michigan Court of Appeals and the Michigan Supreme Court on direct appeal.  In that ground, Petitioner argues that, because he had refused to talk to police and requested an attorney on January 25, 2002, the statement taken by Investigator Simon on January 26, 2002 was unconstitutional under the holding of *Edwards v. Arizona*, 451 U.S. 477 (1981).  In Ground V, Petitioner also argues that he did not validly waive his *Miranda* rights because Simon coerced his confession by promises of leniency.

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. CONST., am. 5, cl. 3.  In conjunction with the Fourteenth Amendment's Due Process Clause, the Fifth Amendment requires that "a confession be voluntary to be admitted into evidence."  *Dickerson v. United States*, 530 U.S. 428, 433 (2000).  According to well established Supreme Court precedent, in order to admit a confession, the prosecution must show that the defendant was advised of certain basic rights – commonly known as *Miranda* rights – and must knowingly and intelligently waive those rights.  *Id.* at 435.

Even so, "the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good . . . . Admissions of guilt resulting from valid *Miranda* waivers are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law."  *Texas v. Cobb*, 121 S. Ct. 1335, 1342 (2001) (quotation and citation omitted).  The cases in which a defendant can make a colorable argument that a confession

- 15 -

was compelled despite the fact that law enforcement authorities adhered to *Miranda* are rare. *Dickerson*, 530 U.S. at 444 (citations omitted).

When a criminal defendant claims that his confession was rendered involuntary by police coercion, the court must inquire whether, considering the totality of the circumstances, the conduct of law enforcement officials overbore the will of the accused.  *See Mincey v. Arizona*, 437 U.S. 385 (1978); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973).  A suspect's state of mind, standing alone, cannot render a statement involuntary.  Rather, coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession.  *See Colorado v. Connelly*, 479 U.S. 157, 163-67 (1986).  Typically, findings of coercive police conduct involve brutality or threats of physical coercion.  *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991) (threats of physical violence); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (defendant interrogated for eighteen hours without food or sleep while on medication); *Beecher v. Alabama*, 389 U.S. 35 (1967) (gun held to head of wounded suspect to extract confession); *Cooper v. Scroggy*, 845 F.2d 1385 (6th Cir. 1988) (officer struck defendant, failed to take steps to change coercive environment, and other detective threatened defendant).  Nevertheless, a confession may be rendered involuntary if it is the product of psychological pressure or coercion sufficient to overbear the will of the accused.  *See Fulminante*, 499 U.S. at 287-88.  Among the circumstances to be reviewed by the habeas court are "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition and mental health."  *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993) (citations omitted).

The Supreme Court repeatedly has reaffirmed that, when a suspect who is in custody has asked for a lawyer, the suspect must not be subjected to further interrogation until a lawyer has been provided, unless the suspect thereafter initiates a discussion. *See Edwards*, 451 U.S. at 484; *Arizona v. Roberson*, 486 U.S. 675, 680 (1988) (citing *Miranda*, 384 U.S. at 474). The rule is designed to prevent police "'badgering' or 'overreaching' – explicit or subtle, deliberate or unintentional – [that] might otherwise wear down the accused and persuade [the suspect] to incriminate himself." *Smith v. Illinois*, 469 U.S. 91, 98 (1984). Determining whether a custodial statement is improper after the a suspect has invoked his right to counsel requires a two-part inquiry:

> First, courts must determine whether the accused actually invoked his right to counsel. . . . Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

*Smith*, 469 U.S. at 95. *See also Van Hook v. Anderson*, 488 F.3d 411, 416 (6th Cir. 2007) (en banc). Under the first inquiry, the court must determine whether the suspect unambiguously requested counsel. *Van Hook*, 488 F.3d at 414 (citing *Davis v. United States*, 512 U.S. 452, 458 (1994)).

The trial court conducted an evidentiary hearing on Petitioner's motion to suppress his January 26, 2002 statement. On the second day of that hearing, Sergeant Felix Kurt testified that, on January 25, 2002, he was instructed by his squad leader, Lieutenant Nolan, to go to the Wayne County Jail to try to get a statement from Petitioner, who was being held on unrelated charges. (Hr'g Tr. II at 5.) Kurt went to the jail, and jail deputies provided an area for him to meet with Petitioner. After asking Petitioner a few preliminary questions to complete the interrogation form, Kurt concluded that the area in which they were meeting, a common area or hallway, was not conducive to questioning. (*Id.* at 6-7, 12-15.) Kurt therefore terminated the interview without questioning

- 17 -

Petitioner about the incident, and he advised Petitioner that someone else would be speaking with him later. (*Id.* at 7, 19-20.) Noticing that Petitioner's last name had at one time been Hockaday, Kurt mentioned having known Petitioner's father from years before, and the two spoke about Petitioner's father for a few minutes. (*Id.* at 8-9, 19-20.) Kurt did not advise Petitioner of his *Miranda* rights because he did not get to the point of taking a statement. (*Id.* at 12-16.) Kurt expressly denied that Petitioner at any time asked to speak with an attorney or his mother. (*Id.* at 16.)

Detroit Police Investigator Barbara Simon testified about taking a statement from Petitioner the following day, January 26, 2002. Petitioner was arrested about 30 to 45 minutes before Simon took his statement in the homicide section of the department. (Hr'g Tr. I at 5.) Before taking the statement, Simon advised Petitioner of his rights, using the Detroit Police Constitutional Rights Form. Simon asked whether Petitioner, who had completed high school, could read and write. She then asked Petitioner to read each of his rights out loud. She also asked him to initial each right if he understood it, and Petitioner initialed each of the five rights. (*Id.* at 6, 9.) She also asked Petitioner to sign the waiver-of-rights form, which he did. (*Id.*) The form was introduced into evidence. (*Id.* at 7.) Simon indicated that, based on her experience as a police officer for 24½ years, Petitioner was not under the influence of alcohol or drugs at the time of his statement. (*Id.* at 8.)

According to Simon, Petitioner agreed to make a statement. (*Id.*) Simon made no promises or threats, nor did she suggest that Petitioner would receive a lesser charge for his testimony. (*Id.* at 9-10.) The statement was taken in question and answer form. After the statement was complete, Simon asked Petitioner to sign each page of the first, narrative section and to separately sign next to each answer on the shorter questions. (*Id.* at 11.) Petitioner was also asked

- 18 -

and signed next to the answers to questions about whether he was threatened or promised anything, whether he was on medication, and whether he was deprived of food or the use of a restroom.  (*Id.* at 12.)  Simon then identified Petitioner's statement, on which Petitioner had signed his name 26 times.  (*Id.* at 13.)  On page five of the statement, Petitioner initialed next to a correction made as he was reading the statement.  (*Id.* at 14.)  Simon testified that she did not tell Petitioner about the possible charges he faced, though she believed at the time she started the interview that he was one of the shooters.  (*Id.* at 19.)  She also did not inform Petitioner that Nelson Page, Rahim, and Mario were going to or had given evidence against him.  (*Id.* at 20.)

Petitioner testified that, on January 25, 2002, he told Sergeant Kurt that he did not want to talk to him and that he wanted to speak with his attorney and his mother.  (*Id.* at 25.)  According to Petitioner, on January 26, Simon told Petitioner that there were three people turning state's evidence against him and, if he wanted to go home, he should tell her what happened and sign the statement.  Petitioner believed he would be going home because he originally had been brought in only to arrange for a tether on another charge.  (*Id.* at 26.)  Petitioner also testified that Simon had told him that he would get life in prison if found guilty of the kind of charge he was facing.  (*Id.* at 27.)  Finally, Petitioner testified that Simon told him that, if he did not talk to her, she would get a warrant and have him go through a lineup.  (*Id.* at 28.)

Petitioner's mother, Catherine Cato, testified that she spoke with her son by telephone after he provided his statement to Investigator Simon.  (*Id.* at 38.)  During that same call, Catherine Cato also spoke to Simon, who told her that she was trying to help Petitioner and that she wanted to talk to him to make sure everything was clear.  (*Id.* at 38-39.)  In addition, Catherine Cato testified that she had spoken with her son the day before, after he had spoken with Sergeant Kurt.  At that

- 19 -

time, Petitioner told his mother that he had been told that someone was going to come back the next day, and he informed her that he did not want to talk with that person without her or a lawyer present.  (*Id.* at 40.)  The court asked if phone records could be obtained from Catherine Cato's phone or from the jail.  (*Id.* at 41.)  On the second day of the evidentiary hearing, the defense indicated it was having difficulty in obtaining the telephone records, and the court agreed to issue a subpoena.  (Hr'g Tr. II at 21-22.)  On the final day of hearing, defense counsel indicated that the requested telephone records went beyond the phone companies' retention periods.  Similarly, the Wayne County Jail telephone records were beyond the retention period.  (Hr'g Tr. III at 3-5.)

Following arguments by the parties, the court concluded that, while it found some portions of the varying testimony to be more or less persuasive, on the totality of the circumstances, the government had met its burden of showing that the statement was knowing and voluntary.  (*Id.* at 19.)

The Michigan Court of Appeals issued a lengthy opinion on this issue, in which it accurately stated the applicable constitutional standards, thoroughly and accurately described the testimony, and quoted from the trial court's lengthy ruling.  The court of appeals found as follows:

> We conclude that although the trial court's colloquy was at times less than a model of clarity, in the final analysis, it is clear that the court weighed the testimony, determined it found Kurt and Simon credible and, having had the opportunity to observe all the witnesses, unlike this Court, then concluded that under the totality of the circumstances defendant's waiver of his *Miranda* rights was voluntary, knowing and intelligent.  We find no error in the court's determination that the prosecution established a valid waiver by a preponderance of the evidence.

(6/3/04 MCOA Op. at 8.)

The state court's determination constitutes a reasonable application of established Supreme Court precedent.  First, the court of appeals expressly concluded that the trial court, while

- 20 -

not entirely clear in its analysis, had found Kurt and Simon to be credible.  That finding is one of

fact, which is entitled to a presumption of correctness.  *See Sumner*, 449 U.S. at 546; *Smith*, 888 F.2d

at 407 n.4.  Petitioner does not attempt to make a factual showing to refute that presumption, beyond

reiterating his own testimony at the hearing.  Instead, he asserts that the state-court determination

is not entitled to deference because the court of appeals did not address whether Petitioner actually

requested counsel.

Petitioner's argument is unpersuasive.  Where the state appellate court has issued a

an affirmance, that affirmance is presumed to have been made on the merits, and a federal court

cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.

*See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).  Only where circumstances indicate that the

state court has not addressed the merits of a claim does this Court conduct a *de novo* review.  *See*

*Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the

merits "may be overcome when there is reason to think some other explanation for the state court's

decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de*

*novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir.

2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not

addressed by the state courts).

Contrary to Petitioner's argument, the state court did not fail to consider or address

the question of whether Petitioner had expressly invoked his right to counsel.  The court set forth the

federal constitutional standard for interrogations that occur after the invocation of the right to

counsel, expressly citing *Edwards*, 451 U.S. at 484-85.  In addition, the court of appeals found that

the trial judge's conclusions demonstrated that the judge believed Sergeant Kurt's version of the

January 25, 2002 incident.  Kurt's testimony was irrelevant to any question other than whether Petitioner had invoked his right to counsel on January 25, 2002, the sole question relevant to determining whether the January 26, 2002 statement was taken in violation of *Edwards*.  As a result, the court of appeals' opinion firmly supports a conclusion that the court considered the *Edwards* issue and decided that issue against Petitioner.

Moreover, the finding of the court of appeals was an entirely reasonable determination of the facts based on the evidence presented at the evidentiary hearing.  While the trial court's analysis was convoluted, the court unquestionably found that Kurt's description of the incident and his testimony that Petitioner never requested counsel was more persuasive than Petitioner's claim that he had invoked his right to counsel.  In addition, the evidence provided by Petitioner's mother did not support Petitioner's claim that he requested counsel during his conversation with Kurt.  Instead, she testified that she spoke with Petitioner only after his conversation with Kurt, and Petitioner indicated at that time that he intended not to speak with police the following day without an attorney or his mother present.  (Hr'g Tr. I at 40.)  Petitioner did not tell his mother that he had already asked for an attorney.  Based on all the evidence, the trial court found that, in the absence of any written or better evidence that Petitioner had invoked his right to counsel, the court was going to credit the police version.  (Hr'g Tr. III at 18-19.)  As a consequence, the finding of the court of appeals that the trial court had rejected Petitioner's *Edwards* claim was entirely reasonable.[2]

---

[2]The Court notes that, in light of recent Supreme Court decisions, it is not at all clear whether Petitioner's invocation of his right to counsel in the presence of Sergeant Kurt would foreclose the subsequent interrogation by Simon.  In *Howes v. Fields*, 132 S. Ct. 1181(2012), the Supreme Court held that a prisoner who is taken from his cell to be interviewed in a conference room on a matter unrelated to the crime under which he is being held, is not presumptively in custody for purposes of *Miranda*.  *Id.* at 1189.  Instead, the determination of custody is based on whether the prisoner is in a situation "in which the concerns that powered the [*Miranda*] decision are implicated."  *Id.* at 1192.  Absent some compelling indications that the prisoner was not free to leave – a situation that unquestionably did not exist in the instant case – a prisoner who is questioned under such circumstances is not "in custody" for purposes

Finally, the court of appeals also reasonably concluded that the trial court properly found Petitioner's statement to be knowing, voluntary and intelligent and that he had validly waived his *Miranda* rights when he spoke with Simon.  Beyond reiterating his trial-court arguments that he had never been interrogated before and that Simon had coerced his statement by leading him to believe he could go home, Petitioner's brief makes no attempt to overcome the presumption that Petitioner validly waived his rights on January 26, 2002.  Even accepted at face value, Petitioner's factual assertions fail to establish official coercion, as a matter of law.  Simon's comprehensive testimony and Petitioner's 26 signatures on his statement provide overwhelming evidence that Petitioner was advised of his rights and knowingly, voluntarily and intelligently relinquished them.  As a consequence, the state-court's conclusion constituted a reasonable application of established Supreme Court precedent.

## II.    Ground II:  *Blakely* Claim

In his second ground for habeas relief, Petitioner argues that the trial court judge violated his Sixth Amendment right to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt.  Petitioner bases his argument on the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. 296 (2004).  *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge.  Applying the Washington mandatory sentencing guidelines, the trial judge

---

of *Miranda*.  *Id.* at 1193.  If he was not in custody at the time of Kurt's contact with him, he is not entitled to have his statement suppressed under the prophylactic rule of *Edwards*, which only applies to persons who are in custody at the time they invoke their right to counsel.  *See Edwards*, 451 U.S. at 484; *Roberson*, 486 U.S. at 680.  As a result even if the court erred in analyzing the claim under *Edwards*, Petitioner would not be entitled to habeas relief because the error would have been rendered harmless by the intervening change in Supreme Court precedent.  *See Desai v. Booker*, 538 F.3d 424, 428 (6th Cir. 2008).

found facts that increased the maximum sentence faced by the defendant.  The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt.  *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term.  The maximum sentence is not determined by the trial judge, but is set by law.  *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8).  Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)).  The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely*.  *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007).  Therefore, the state court's determination of Petitioner's claim was not contrary to federal law clearly established by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

III.     Ground III:  Suggestive Identification

Respondent argues that Petitioner's remaining claims are procedurally defaulted, because they were not presented to the state courts on direct appeal.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from

- 24 -

considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.

However, federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  Where, as here, the procedural default issue raises more questions than the case on the merits, the court may assume without deciding that there was no

procedural default or that Petitioner could show cause and prejudice for that default.  *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

Petitioner's first claim in his post-judgment motion was that he was denied due process by Michael Pemberton's identification of Petitioner in the courtroom.  Petitioner asserts that, because he was seated at the defense table with his attorney, the circumstances of the identification were unduly suggestive.  He contends that Pemberton should not have been permitted to identify him at the preliminary examination without having previously participated in a non-suggestive identification proceeding.

The Supreme Court recently held in *Perry v. New Hampshire*, __ U.S. __, 132 S. Ct. 716 (2012), that the Due Process Clause does not require preliminary judicial inquiry into the reliability of eye witness identification unless the identification was procured under unnecessarily suggestive circumstances arranged by law enforcement officers.  In the absence of official misconduct, challenges to the reliability of eye witness identification are matters for the jury to determine on the basis of the evidence, and do not require previous judicial screening on due process grounds.  "The fallibility of eye witness evidence does not, without the taint of improper state conduct, warrant a due-process rule requiring a trial court to screen the evidence for reliability before allowing the jury to assess its creditworthiness."  132 S. Ct. at 728.  In this case, Petitioner does not assert that the identification was procured under unnecessarily suggestive circumstances arranged by law enforcement.  Consequently, under *Perry*, the question of the reliability of the in-court identification was one for the jury, and Petitioner was not entitled to a ruling from the trial judge on the issue.

Under the AEDPA, the Court is generally required to review the state-court decision on the basis of the law as it existed at the time of the decision. *See Onifer*, 255 F.3d at 318. At the time of Petitioner's conviction and direct appeal, the controlling Sixth Circuit authority on the issue of suggestive identifications was *Thigpen v. Cory*, 804 F.2d 893 (6th Cir. 1986). Under *Thigpen*, a trial judge was required to conduct a preliminary assessment of the reliability of an eye witness identification made under suggestive circumstances, even if not arranged by police. 804 F.3d at 895.

*Thigpen*, however, was expressly abrogated by the Supreme Court's decision in *Perry*. The Sixth Circuit has held that a petitioner cannot obtain relief on the basis of the state court's alleged unreasonable application of precedent that no longer is good law. *See Desai*, 538 F.3d at 428. In other words, habeas corpus relief is not warranted in cases where a change in the law would not benefit the petitioner if he was granted relief. If Petitioner was granted a new trial in this case, the proceedings would be conducted under current law, including *Perry*, 132 S. Ct. at 728, and Petitioner would not be entitled to a hearing on the issue of identification.

## IV. Ground IV: Prosecutorial Misconduct

In his fourth ground for habeas relief, Petitioner asserts that he was denied due process by the prosecutor's improper vouching for a witness. Specifically, he complains about the following exchange between the prosecutor and Desean Butler:

Q      . . . Now Mr. Butler you have entered into a plea agreement with the Wayne County Prosecutor's about your cooperation in this particular case, is that correct?

A.      Yes.

Q      What are they, sir?

A      That I testify.

Q      Truthfully and honestly?

A      Yes.

(Tr. II at 152-53.)  Petitioner asserts that, by asking whether the plea agreement required Butler to testify truthfully and honestly, the prosecutor impermissibly suggested some special knowledge on the part of the prosecutor that Petitioner was telling the truth.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13;  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

The federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see Wogenstahl v. Mitchell*, No. 07-4285, slip op. at 22-23 (6th Cir. Feb. 2, 2012) (treating the two aspects of

vouching as part of a single standard).  The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility.  *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.  *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965);  *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).  Petitioner's argument relies on the second type of vouching.

Petitioner's claim does not meet the high standard required to establish a due process violation through improper vouching for a witness.  The Sixth Circuit consistently has held that it is not improper vouching to refer to a promise to testify truthfully as part of a plea agreement. *See United States v. Sherrills*, 432 F. App'x 476, 483 (6th Cir. 2011); *United States v. Owens*, 426 F.3d 800, 806 (6th Cir. 2005); *United States v. Trujillo*, 376 F.3d 593, 608–09 (6th Cir. 2004).  Indeed, in *United States v. Tocco*, 200 F.3d 401, 422 (6th Cir. 2000), the court held that the introduction of a plea agreement containing a statement that the witness already had "provided truthful and very valuable testimony" in exchange for his plea did not amount to vouching. *Id.*

Here, the prosecutor's question did no more than develop the specifics of the plea agreement.  It was brief and contained no suggestion that the prosecutor had information of Petitioner's guilt beyond the evidence before the jury.  Instead, especially in the context of the remaining discussion about the content of the plea agreement, the prosecutor's comments clearly were directed toward having the jury understand the whole of that agreement.  Moreover, instructing a jury that the attorneys' comments are not evidence and instructing the jury regarding the methods

it should use to evaluate credibility have routinely been held cure any improprieties. *Byrd v. Collins*, 209 F.3d 486, 538 (6th Cir. 2000). In this action, the court gave both instructions. (Tr. III at 37-41.) For all these reasons, Petitioner's claim does not rise to the constitutional level. The state court's rejection of the claim, therefore, was neither contrary to nor an unreasonable application of established Supreme Court precedent.

## V.        Ground VI:  Equal Protection

Petitioner next argues that the prosecutor violated his right to equal protection when it offered a plea agreement to Butler while not offering it to Petitioner. Petitioner's argument is meritless.

The government is afforded broad discretion in determining "who will be charged and with what crime." *United States v. Mullins*, 22 F.3d 1365, 1373 (6th Cir. 1994) (citing *Wayte v. United States*, 470 U.S. 598, 607 (1985)). Prosecutorial decisions such as the offer of a plea agreement routinely are upheld under the Equal Protection Clause unless they are "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." *Wayte*, 470 U.S. at 608. Petitioner wholly fails to either allege or support that the prosecutor's decision was motivated by a deliberate and arbitrary classification. He therefore fails to establish an equal protection claim.

## VI..      Ground VII:  Confrontation Clause

In his seventh habeas ground, Petitioner argues that he was deprived of his right to confrontation when Dr. Hlavaty testified about the autopsy results, though she did not herself perform the autopsy. The trial court rejected the claim as follows:

Defendant alleges a denial of the right to confrontation when the assistant county medical examiner testified at trial in place of the medical examiner that performed the actual autopsy. Defendant is simply incorrect. The assistant medical examiner was a qualified expert and offered proper opinion testimony. MRE 702, MRE 704. Any objection by the defense would have been meritless and hence unnecessary. MRE 702, MRE 704. *See also People v Snider*, 239 Mich App 393, 425 (2000). Defendant is not entitled to relief.

(6/1/06 Cir. Ct. Op., docket #25.)

Testimonial out-of-court statements by witnesses are barred under the Confrontation Clause unless witnesses are unavailable and defendants had a prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by the court. *Crawford v. Washington*, 541 U.S. 36 (2004) (abrogating *Ohio v. Roberts*, 448 U.S. 56 (1980)). In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 2532 (2009), the Supreme Court held for the first time that the affidavits of forensic analysts are testimonial statements that are covered by the Confrontation Clause and subject to analysis under *Crawford*. *Id.* A habeas court is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer*, 255 F.3d at 318; *see also Lockyer*, 538 U.S. at 71-72. Because *Melendez-Diaz* was not decided until 2009, it is not applicable to Petitioner's case, which became final in 2005. As a consequence, at the time Petitioner was tried and convicted, no clearly established Supreme Court precedent barred the admission of forensic evidence without the in-court testimony of the forensic analyst. *See Vega v. Walsh*, 669 F.3d 123, 127-28 (2d Cir. 2012) (holding that the rule of *Melendez-Diaz* was inapplicable on habeas review of a 2002 state-court decision).[3]

---

[3]In addition, it is far from clear that the holding in *Melendez-Diaz*, 129 S. Ct. at 2532, barred an expert witness from testifying to the results of an autopsy conducted by a different medical examiner. In *Vega*, the Second Circuit considered a case on all fours with this one. There, as here, a medical examiner testified at trial about an autopsy

In sum, the state-court's rejection of Petitioner's confrontation claim was neither contrary to nor an unreasonable application of Supreme Court precedent that was clearly established at the time of the state court's determination.

VII.    Grounds VIII & X:  Ineffective Assistance of Counsel

In Ground VIII of his habeas application, Petitioner claims that his trial attorney rendered ineffective assistance in a variety of ways:  (1) failing to object to the prosecutor's improper comments during closing arguments; (2) failing to object to the prosecutor's improper use of the plea agreement to vouch for witness Butler; (3) failing to secure expert testimony regarding eyewitness identification; (4) failing to secure proper jury instructions; and (5) failing to object to hearsay evidence.  In Ground X, Petitioner alleges that his appellate attorney was ineffective in failing to raise the many claims Petitioner presented in his motion for relief from judgment to the state courts and in his habeas petition.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The

---

conducted by a different medical examiner.  The *Vega* court indicated that, even if the 2009 *Melendez-Diaz* decision were applicable on habeas review to a state-court decision that was final before *Melendez-Diaz* was decided, it remained an open question whether the introduction of autopsy evidence was controlled by *Melendez-Diaz*, in light of the "significant differences between narcotics and blood alcohol analyses and autopsies."  *Vega*, 669 F.3d at 128 n.2.

defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

As the Supreme Court recently has observed, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Richter*, 131 S. Ct. at 788 (citing *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009));

*Premo v. Moore*, 131 S. Ct. 733, 740 (2011).  In those circumstances, the question before the habeas

court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential

standard."  *Id.*

Applying the *Strickland* standard, the Wayne County Circuit Court addressed both

ineffective assistance claims together:

> The defendant does not present actual evidence of misconduct on the part of
> his attorneys; what he would like to construe as ineffective assistance on their part
> (which evidence to contest, which motions to file, how to question a witness) is
> properly considered trial strategy and appellate tactics.  His attorneys raised many key
> issues and the court simply did not find those arguments persuasive.  The record does
> not indicate that his attorneys were ineffective such that they prejudiced the
> defendant's constitutional right to defend himself.

(6/1/06 Cir. Ct. Op. at 2.)  The court's decision was patently reasonable.

First, although Petitioner states that counsel was ineffective by failing to object to

improper closing arguments, he fails entirely to identify which alleged comments were improper.

Indeed, he makes no reference to the prosecutor's closing argument except in the title of his claim.

As a consequence, Petitioner fails to demonstrate either that counsel rendered deficient performance

or that Petitioner was prejudiced.

With respect to the prosecutor's allegedly improper question to Desean Butler about

the content of his plea agreement, I previously have rejected Petitioner's claim of prosecutorial

misconduct.  Counsel's failure to make a frivolous or meritless motion or objection does not

constitute ineffective assistance of counsel.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir.

2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x

309, 311 (6th Cir. 2004).  Because the underlying claim of prosecutorial misconduct lacks merit,

counsel's failure to object was neither erroneous nor prejudicial.

- 34 -

Petitioner's next assertion is that counsel was ineffective for failing to call an expert witness to testify about the unreliability of eyewitness identification. His argument is without merit. Defense counsel extensively cross-examined Michael Pemberton, raising significant questions about Pemberton's credibility in making the identification. Defense counsel started with Pemberton's own comment during direct examination: "I[t] happened so fast. Everything happened so fast." (Tr. II at 96.) Counsel obtained Pemberton's admission that the entire episode was not more than two minutes, and only ten seconds elapsed from the arrival of the second assailant until the shooting. (*Id.* at 98.) Petitioner was on the opposite side of the vehicle from Pemberton, and Pemberton directly faced the other assailant, Nelson Page, whom he identified at a lineup. (*Id.* at 99.) Counsel obtained Pemberton's admission that he had never identified Petitioner before trial and had never been asked to view a lineup with Petitioner. (*Id.* at 99-101.) Counsel pointed out that Pemberton estimated Petitioner's height at 5'8" to 6', about the same height as Pemberton himself, while Petitioner was significantly smaller. (*Id.* at 102-03.) Pemberton was induced to back-pedal, indicating that Petitioner's afro was large and that Pemberton did not have a gun in his face at trial, as he did at the time of the incident. (*Id.* at 103-04.) From that comment, defense counsel was able to force Pemberton to acknowledge that, at times during the ten seconds, his focus was more on the person in front of him, who was pointing a gun at him. (*Id.* at 104-05.) He also pointed out a discrepancy between Pemberton's testimony about the guns introduced into evidence, which initially did not correspond with his statement. (*Id.* at 105-06.) Finally, he challenged Pemberton's ability to see clearly in the low-light conditions. (*Id.* at 106-07.)

In these circumstances, defense counsel's decision to challenge the identification by cross-examination was entirely reasonable. *See Dorch v. Smith*, 105 F. App'x 650, 653 (6th Cir.

2004) (upholding as reasonable the Michigan Court of Appeals's conclusion that defense counsel's failure to call an expert witness on eyewitness identification did not satisfy *Strickland*, in part because counsel cross-examined the eyewitness regarding inconsistencies in his identification of the petitioner); *Tipton v. United States*, No. 96-5026, 1996 WL 549802, at *1-2 (6th Cir. Sept. 26, 1996) (holding that "any allegedly ineffective assistance" caused by counsel's failure to "hir[e] an expert in eyewitness identification" did not prejudice the petitioner within the meaning of Strickland).  As the Sixth Circuit has held:

> The Constitution does not require defense counsel to pursue every trial strategy imaginable, whether likely to bear fruit or not.  *See Engle v. Isaac*, 456 U.S. 107, 134, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982).  No precedent establishes that defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment. And there is nothing about this case suggesting that such a witness was imperative here.

*Perkins v. McKee*, 411 F. App'x 822, 833 (6th Cir. 2011).   Petitioner's claim of ineffective assistance of trial counsel based on the eyewitness testimony therefore is without merit.

Petitioner next argues that counsel was ineffective in failing to object to the admission of the autopsy evidence through Dr. Hlavaty.  Petitioner contends that the evidence was inadmissible hearsay under the Michigan Rules of Evidence.  As previously discussed, the admission of Dr. Hlavaty's evidence was not a violation of the Confrontation Clause.  In addition, as the state court indicated, Dr. Hlavaty's testimony was proper expert testimony that the medical examiner was qualified to give under MICH. R. EVID. 702, 704.  (6/1/06 Cir. Ct. Op. at 3.)  Further, even had some portion of Hlavaty's testimony been hearsay, Petitioner experienced no prejudice from its admission. Petitioner did not dispute the fact that Staunton was killed by a single bullet entering the back and exiting the front.  Hlavaty's evidence was limited to establishing that simple fact.  As the trial court

concluded, any objection by defense counsel to the admission of the evidence would have been meritless.  Counsel's failure to object, therefore, was neither unreasonable nor prejudicial.  *See Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506.

In his final claim of ineffective assistance of trial counsel, Petitioner asserts that counsel was ineffective in failing to secure proper jury instructions.  Petitioner fails, however, to identify any jury instruction he believes was erroneous.  Petitioner does no more than mention the jury instructions in the title of his claim for relief.  He therefore fails to overcome the presumption that counsel's performance was adequate.

In sum, Petitioner fails to demonstrate that the state court unreasonably rejected his claim of ineffective assistance of trial counsel.

Petitioner's claim of ineffective assistance of appellate counsel was raised solely to demonstrate cause excusing his procedural default of the claims raised for the first time in his motion for relief from judgment.  Because each of Petitioner's claims has been rejected on its merits, not on the grounds of procedural default, Petitioner need not demonstrate cause excusing his failure to raise those claims on direct appeal.  Moreover, the claim of ineffective assistance of appellate counsel is entirely dependent upon Petitioner's other claims.  Inasmuch as all of those claims have been rejected, no basis exists for concluding that appellate counsel was ineffective in failing to raise them on direct appeal.  *See Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003) ("'[A]ppellate counsel cannot be ineffective for a failure to raise an issue that lacks merit.'") (quoting *Greer*, 264 F.3d at 676).  *See also Bradshaw*, 591 F.3d at 523.

VIII.   Ground IX:  Cumulative Error

Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law.  *Bailey*, 271 F.3d at 655.  The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on habeas review.  "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."  *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002).  Finally, because I concluded above that the individual claims are without merit, Petitioner cannot show that the cumulative error violated his constitutional rights.  *See Seymour*, 224 F.3d at 557.

IX.   Ground XI:  Actual Innocence

In his eleventh ground for habeas relief, Petitioner asserts that he is actually innocent of the offenses for which he was convicted.  As Petitioner correctly recognizes in his motion to supplement his habeas petition, "claims of actual innocence based on newly discovered evidence have never been held to [] state grounds for federal habeas relief absent an independent constitutional violation occurring in the course of the underlying claim."  (Pet'r's Mot. to Supp., docket #35 at 2, Page ID#370.)  *See Herrera v. Collins*, 506 U.S. 390, 400 (1993).  Instead, a claim of actual innocence can only be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims."  *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995).  The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which

a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404).

As previously discussed with respect to Petitioner's claim of ineffective assistance of appellate counsel, Petitioner's independent constitutional claims have not been rejected on procedural grounds; they have been individually addressed on the merits. As a consequence, Petitioner's gateway claim of actual innocence is both unnecessary and unavailing.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:   April 23, 2012                     /s/  Joseph G. Scoville
                                            United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).